**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANDREW HANGO, | ) | CASE NO. 1:19cv00606 |
| | ) | |
| Petitioner, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| REBECCA ADDUCCI, Field Director, | ) | |
| Detroit Field Office, Immigration and | ) | |
| Customs Enforcement, | ) | **REPORT &** |
| | ) | **RECOMMENDATION** |
| Respondent. | ) | **and ORDER** |
| | ) | |

This matter has been referred to the undersigned United States Magistrate Judge for preparation of a Report and Recommendation pursuant to Local Rule 72.2(b)(2).  Before the Court are the Petition of Andrew Hango ("Hango" or "Petitioner"), for a Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2241 (Doc. No. 1), and Petitioner's Motion, as supplemented, seeking either a Preliminary Injunction directing his release from custody or, in the alternative, an expedited determination of his Habeas Corpus Petition.  (Doc. Nos. 32, 33, 35.)   Hango is in the custody of the Detroit Field Office of U.S. Immigration and Customs Enforcement ("ICE") at the Seneca County Jail pursuant to 8 U.S.C. § 1231(a)(6).  (Doc. No. 1 at 9;  Doc. No. 36-1 , Ex. 1, ¶9.)  For the reasons set forth below, it is recommended that Petitioner's Motion for Preliminary Injunction, as supplemented, be GRANTED, and the Petition for Habeas Corpus be DISMISSED.

## I. Summary of Facts[1]

### A.    Procedural History

Hango, a citizen of Tanzania, arrived in the United States on a student visa in 1997.  (Doc.

No. 1 at 3.)  He failed to maintain his student status because he did not attend school.  (*Id.*)  On

September 1, 2001, ICE issued a Notice to Appear, charging Hango as removable from the United

States under I.N.A. § 237(a)(1)(C)(i) for failure to maintain his non-immigrant status.  (Doc. No. 16-

2.)  Hango was placed in removal proceedings and, on October 2, 2002, was granted voluntary

departure with an alternate order of removal.  (Doc. No. 16-3.)  When Hango failed to deport

voluntarily, the order of removal became effective and enforceable.[2]  (*Id.*)

On March 6, 2019,[3] Hango appeared at the ICE office in Cleveland, Ohio for a scheduled

check in, and ICE took him into custody in order to deport him.  (Doc. No. 13 at 3.)  He is currently

detained by ICE at the Seneca County Jail.  (Doc. No. 1 at 9; Doc. No. 36-1 , Ex. 1, ¶9.)  On March

19, 2019, Hango filed the Petition for Writ of Habeas Corpus in this case.  (*Id.*)  On May 17, 2019,

---

[1]  This immigration action has been contested since 2001, and thus the record is
extensive.  In this report and recommendation, the Court recites only the facts relevant to
the Petition and Motion addressed herein.

[2]  In the time between the October 2, 2002 order and March 6, 2019, when the detention
challenged in Hango's current habeas petition began, Hango attempted to reopen his
immigration proceedings several times, and the government attempted to deport him
multiple times.  (Doc. No. 1 at 8, Doc. No. 13 at 2.)  During this period, Hango was taken
into custody for 21 months before being released under an order of supervision by the
U.S. District Court for the Western District of Louisiana.  (Doc. No. 1 at 8, *see also*,
*Hango v. Att'y General*, 3:05-cv-02196, Judgment Adopting Report and
Recommendation of the Magistrate Judge (W.D. La. Nov. 6, 2006).)

[3]  This date is stated as March 6, 2019 in some places, and March 16, 2019 in others.
(*See, e.g.,* Doc. No. 1 at 3, 9.)  The distinction has no bearing on the issues in this
Petition.

the government of Tanzania issued a travel document for Hango. (Doc. No. 16 at 3.) ICE twice scheduled Hango's deportation, in June 2019 and August 2019, but both times removal was cancelled because Hango had requests for stays of removal in connection with his Writ pending at the Supreme Court. (*Id.*) On October 7, 2019, the Supreme Court denied Hango's petition for writ of certiorari. (Doc. No. 36-1, ¶ 4.2.) On November 19, 2019, the Supreme Court denied his Petition for Rehearing. (*Id.*)

ICE again scheduled Hango's removal on November 13, 2019. (Doc. No. 36-1, ¶5.) This third attempt at removal failed because Hango refused to board the plane on which ICE had booked his passage. *(Id.*, Ex. A.) He was issued a Notice of Failure to Comply, pursuant to 8 CFR 241.4(g), which informed him that he would remain in ICE custody "until you demonstrate that you are making reasonable efforts to comply with the order of removal, and that you are cooperating with ICE's efforts to remove you." (*Id.*)

Hango's removal was rescheduled for February 11, 2020. (*Id.*, ¶6.) This removal was also cancelled because Hango filed his seventh motion to reopen and motion for stay with the Immigration Court, and requested that the Tanzanian government not release his travel document to ICE due to his pending litigation. (*Id.*)

On February 12, 2020, the Immigration Judge ("IJ") denied Hango's motion to reopen. (*Id.*, ¶7.) The IJ found that Hango repeatedly filed non-meritorious pleadings in the immigration court and other forums, and that Hango's motion was another in the "long line of actions taken to prolong enforcement of his 2002 removal order." (*Id.*; Ex. B, p. 4.) Hango's travel document has now expired. (*Id.*, Ex. 1, ¶8.) Hango has failed to complete the necessary applications to renew his travel document, and his detention has therefore been extended. (*Id.*, Ex. C.)

3

ICE is currently detaining Hango at the Seneca County Jail in Tiffin, Ohio. (*Id*., Ex. 1, ¶9.) He has been receiving medical care there, "including physician visits and continued administration of his prescribed cholesterol and blood pressure medication regimen." (*Id*.)

**B.     COVID-19**

COVID-19, or the novel coronavirus disease 2019, "is an infectious disease caused by a newly discovered coronavirus." *Coronavirus Overview*, World Health Organization, https://www.who.int/health-topics/coronavirus#tab tab_1. (last visited May 19, 2020) ("*WHO Coronavirus Overview*"). The Centers for Disease Control and Prevention ("CDC") reports that COVID-19 "is spreading very easily and sustainably between people," although it does not spread easily in other ways. *How COVID-19 Spreads,* CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited May 19, 2020). The CDC advises person-to-person spread of COVID-19 can occur (i) between individuals who are in close contact, meaning within about six feet, and (ii) by an infected individual's respiratory droplets produced from sneezing, coughing, or talking. *Id.* The CDC also warns the virus can be spread by people who are not showing symptoms. *Id.* However, "[m]ost people infected with the COVID-19 virus will experience mild to moderate respiratory illness and recover without requiring special treatment." *WHO Coronavirus Overview*.

The CDC has identified certain groups who might be at higher risk for developing severe illness from COVID-19, including"older adults"[4] and "people of any age who have serious

---

[4]  The CDC defined "older adults" as people 65 years and older.

4

underlying medical conditions."[5] *People Who Are at Higher Risk for Severe Illness*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 19, 2020).

On March 9, 2020, Ohio Governor Mike DeWine declared a state of emergency for the entire State of Ohio, "to protect the well-being of the citizens of Ohio from the dangerous effects of COVID-19." *Executive Order 2020-01D* (March 9, 2020). This action was taken based on three positive COVID-19 tests in Ohio, demonstrating the State's belief that the disease was dangerous even when few cases had been reported. *Id.*

As of May 19, 2020, the State of Ohio reports 28,952 confirmed or suspected COVID-19 infections, causing 1,720 deaths.[6] Prison populations have been particularly vulnerable to the spread of the virus. As of May 19, 2020, the Ohio Department of Corrections ("ODC") had tested 8,014 inmates and 4,527 of those tests were positive for COVID-19.[7] However, because Seneca County Jail is not an ODC facility, it has not benefitted from Ohio's broad testing of inmate

---

[5] The underlying medical conditions identified as risk factors include asthma; chronic lung disease; diabetes; serious heart conditions; chronic kidney disease being treated with dialysis; severe obesity; and liver disease; as well as individuals who are immunocompromised from cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of corticosteroids and other immune weakening medications.

[6] *State of Ohio COVID-19 Dashboard*, Ohio Dept. Of Health, https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards/overview (last visited May 19, 2020).

[7] *COVID-19 Inmate Testing*, Ohio Dept. Of Rehabilitation & Correction, https://coronavirus.ohio.gov/static/DRCCOVID-19Information.pdf (last visited May 19, 2020).

populations.  Currently, ICE is detaining 27,908 individuals, and has tested only 2,172 detainees.[8]

No cases of COVID-19 have been confirmed at the Seneca County Jail.[9]

**C.     Hango's Medical Conditions**

In 2014 or 2016, while released on an order of supervision, Hango had a heart attack.[10]

(Doc. No. 39-2 at PageID#359, 487, 493; Doc. No. 35 at 1; Doc. No. 40 at 3.)

In 2017, while released on an order of supervision, Hango had a stroke.[11]  (Doc. No.  39-1

at PageID#359, 381, 487, 494; Doc. No. 35 at 1; Doc. No. 40 at 3.)

Since his detention, Hango has received medical care and medication from ICE.  His medical

care at Seneca County Jail, where he is currently detained, "includ[es] physician visits and continued

administration of his prescribed cholesterol and blood pressure medication regimen." (Doc. No. 39,

Ex. 2.)  Currently, Hango is taking medications to control his blood pressure and high cholesterol,

and blood thinners to treat and prevent blood clots.  (*Id*. at 2.)

As of April 17, 2020, there are zero suspected or confirmed cases of COVID-19 at the

Seneca County Jail.[12]  (*Id*., Ex. 2, ¶16.)

---

[8] *ICE Guidance on COVID-19*, ICE, https://www.ice.gov/coronavirus (last visited May 19, 2020).

[9] *ICE Guidance on COVID-19*, ICE, https://www.ice.gov/coronavirus (last visited May 19, 2020).

[10]  Medical records from Hango's treatment at this time are not in the record, and the date is reported inconsistently in the documents cited here. The prison medical records report the heart attack occurred in 2014, while Hango's Supplement to his Motion for Preliminary Injunction and Response to this Court's order for supplemental briefing states the stroke occurred in "approximately 2016."

[11]  Again, medical records from Hango's treatment at this time are not in the record.

[12]  According to ICE's public reports, as of May 19, 2020, there remained no confirmed cases of COVID-19 at Seneca County Jail.  *ICE Guidance on COVID-19*,

## II. Motion for Preliminary Injunction
## Directing Release from Custody

In this case, Hango seeks through Preliminary Injunction the same remedy that he seeks in his underlying habeas petition: release from detention pending his deportation.  In both his Habeas Petition and Motions for Preliminary Injunction or Expedited Determination of his Petition, Hango asserts that he should be released from immigration detention because he has been subjected to punitive conditions of confinement and has received insufficient medical care in light of his medical history and the general threat posed by the COVID-19 epidemic.

**A.      Standing**

As a threshold issue, the Respondent asserts Hango lacks standing to assert his claim. One "essential aspect" of the limitations that Article III of the Constitution imposes on federal courts is the requirement "that any person invoking the power of a federal court must demonstrate standing to do so." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Here, Respondent argues that Hango has failed to establish the first and third of these requirements.

**1.      Injury in Fact**

Hango asserts that he "faces imminent health and death challenges," because has a high risk of COVID-19 due to his history of heart disease and a compromised immune system due to his

---

https://www.ice.gov/coronavirus (last visited May 19, 2020).

stroke. (Doc. No. 35 at 2-3, 5.) The record shows that throughout his pre-deportation detention, blood work revealed his cholesterol levels and coagulation assays[13] were consistently abnormal, beyond the normal range. (Doc. No. 39-2 at 58-60, 61, 62, 64-66, 99-102, 106, 108-110, 112.)

Respondent contends that Hango lacks standing to seek this Preliminary Injunction because he does not raise a cognizable injury. (Doc. No. 36 at 7.) They assert that "even if" Hango's age and various medical issues place him at high risk, his "assertion that detention *per se* poses an increased risk of contracting COVID-19 is purely speculative," because COVID-19 has not yet been detected in the Seneca County Jail, where Hango is being held. (*Id.* at 8.)

The Supreme Court has explained that the imminence requirement is met when "the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158. Courts around the country addressing similar habeas have found Petitioners have standing, even when there are no confirmed cases of the COVID-19 virus in the facility where they are held. *See, e.g., Awshana v. Adducci,* No. 20-10699, 2020 WL 1808906, at *4 (E.D. Mich. Apr. 9, 2020) ("'a remedy for unsafe conditions need not await a tragic event,' and the plaintiff need not allege present harm to succeed on an unconstitutional conditions claim."); *Castillo v. Barr*, No. CV 20-00605, 2020 WL 1502864, at *4-5 (C.D. Cal Mar. 27, 2020) ("a civil detainee seeking to establish that the conditions of his confinement are unconstitutional need only show that his conditions of confinement "put [him] at substantial risk of suffering serious harm."); *Thakker v. Doll*, No. 1:20-cv-480, 2020 WL 1671563, at *2 (M.D. Penn. Mar. 31, 2020)

---

[13] These assays may reflect the intended effect of his anti-coagulant medications. However, they illustrate that even successful treatment leaves Hango at medical risk.

8

("Respondents would have us offer no substantial relief to Petitioners until the pandemic erupts in our prisons. We reject this notion.")

These cases rely on *Helling v. McKinney*, in which the Supreme Court held the "Eighth Amendment protects against future harm to inmates." 509 U.S. 25, 33 (1993). The Court observed that "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. . . . a remedy for unsafe conditions need not await a tragic event." *Id.* Although *Helling* addressed an Eighth Amendment claim, the Court's reasoning is equally applicable to Hango's Fifth Amendment claim in this case. Hango does not need to demonstrate that he has already been exposed to COVID-19 to seek relief.

Respondent details precautions that ICE is taking to prevent the spread of COVID-19. (Doc. No 36-3, Ex. J.) However, it is undisputed that COVID-19 is spreading through ICE detention facilities despite Respondent's precautions. As of May 19, 2020, ICE had 1,073 confirmed cases of COVID-19 in detainees held in 49 ICE detention centers across the country, as well as 44 confirmed cases in staff members assigned to detention centers in 10 states, including Ohio.[14] Further, ICE reported testing only 2,172 inmates as of that date, making its rate of positive tests more than 48%.[15]

---

[14] As of May 19, 2020, there remained no confirmed cases of COVID-19 at Seneca County Jail. *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last visited May 19, 2020).

[15] On the same date, ICE reported its inmate population as 27,908. *ICE Guidance on COVID*-19, https://www.ice.gov/coronavirus (last visited May 19, 2020).

9

Also as of May 19, 2020, the Ohio Department of Health reports 15 confirmed cases of COVID-19, including 5 hospitalizations and 1 death, in Seneca County, where the jail is located.[16]

Given the exponential spread of the virus, the ability of COVID-19 to spread through asymptomatic individuals, and the inevitable delays of court proceedings, multiple courts have found they may not be able to grant effective relief if a petitioner is forced to wait until his particular facility records a confirmed case. *United States v. Kennedy*, No. 18-20315, 2020 WL 1493481, at *5 (E.D. Mich. Mar. 27, 2020) ("[W]aiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release."); *see also Thakker*, 2020 WL 1671563, at *2 ("Respondents would have us offer no substantial relief to Petitioners until the pandemic erupts in our prisons. We reject this notion."). Therefore, like the numerous other courts which have found that ICE detainees face an imminent injury that is neither conjectural nor hypothetical, this Court finds Hango has shown an injury-in-fact sufficient to satisfy the first element of the standing requirement.

## 2. Redressibility

Hango asserts that his injury can only be redressed by ordering his release (Doc. No. 35 at 5.) Respondent disagrees, asserting that Hango "has greater access to medical monitoring," and "may have greater access to some levels of medical care" in detention than he would have if released. (Doc. No. 36 at 10.) Therefore, they argue that "it is conceivable that Petitioner's risk of exposure is lower in detention." (*Id.*)

---

[16] Ohio Department of Health COVID-19 Dashboard, https://coronavirus. ohio.gov/wps/portal/gov/covid-19/dashboards/overview/ (last visited May 19, 2020). Neighboring counties have much higher numbers of confirmed cases: there are a total of 537 confirmed cases in the six contiguous counties. (*Id.*)

District courts across the country have recognized that "[t]he nature of detention facilities makes exposure and spread of the virus particularly harmful." *Basank v. Decker*, No. 20 Civ. 2518, 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020); *see also Castillo*, 2020 WL 1502864, at *5 ("[T]he Government cannot deny the fact that the risk of infection in immigration detention facilities and jails is particularly high if an asymptomatic guard, or other employee, enters a facility."). As of April 20, 2020, one of the largest COVID-19 clusters in the country is in an Ohio prison, with 1,828 confirmed cases among inmates and 109 confirmed cases among prison staff, underscoring the difficulty of controlling the virus once it enters a detention facility.[17] In *Coreas v. Bounds*, the court noted that, although the Respondents brought the same challenge to redressibility raised here, their own expert testimony established that "detention centers are extraordinarily high-risk environments for spreading contagious disease" and concluded that it was implausible to claim "someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty." *Coreas v. Bounds*, No. TDC-20-0780, WL 1663133, at *6 (D. Md. Apr. 3, 2020).

It is undisputed that there are particular risks associated with outbreaks within detention facilities, even if there are not currently any confirmed COVID-19 cases in a particular facility. For the reasons explained above, the risks to Hango are imminent despite the current lack of confirmed cases in the facility. Therefore, this Court finds Hango's assertion that his risk of injury would be reduced by release is not speculative.

---

[17] Bill Chappell & Paige Pfleger, "73% of Inmates at an Ohio Prison Test Positive for Coronavirus," (National Public Radio Apr. 20, 2020), available at: https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus.

**B.**     **Habeas Relief for Conditions of Confinement**

Hango seeks release from ICE detention through a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  This statute gives district court authority to grant a writ of habeas corpus if a prisoner "is in custody under or by color of the authority of the United States" or is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c) (2018). Respondent, however, argues that § 2241 is an inappropriate vehicle for raising what it characterizes as a challenge to Hango's conditions of confinement.

The Supreme Court has explained that "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus." *Muhammad v. Close*, 540 U.S. 749, 750 (2004).  Respondent cites a Sixth Circuit decision, *Luedtke v. Berkebile*, to support his claim the Court lacks jurisdiction to grant habeas relief because 28 U.S.C. § 2241 "is not the proper vehicle for a prisoner to challenge conditions of confinement." *Luedtke v. Berkebile*, 704 F.3d 465, 466 (6th Cir. 2013).  The Supreme Court has not specified "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement."  *Boumedienne v. Bush*, 553 U.S. 732, 792 (2006).  The Sixth Circuit has addressed this open question, holding that "a § 2241 habeas petition is not the appropriate vehicle for challenging the conditions of . . . confinement." *Velasco v. Lamanna*, 16 F. App'x 311, 314 (6th Cir. 2001).   In 2018, the Sixth Circuit reiterated this holding by affirming a district court decision dismissing a § 2241 petition raising an Eighth Amendment challenge to prison conditions on the basis that the claim must be brought in a civil-rights action. *Solano-Moreta v. Fed. Bureau of Prisons*, No. 17-1019, 2018 WL 6982510 (6th Cir. Sep. 24, 2018); However, other Circuits have taken the opposite position.  *See, e.g., Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ("Habeas corpus tests not only the fact but also the form of detention.") (internal

12

citation omitted); *Roba v. U.S.*, 604 F.2d 215 (2d Cir. 1979) (holding that § 2241 petition may be used to challenge conditions of confinement).

This case is distinct from those cited by Respondent, however, because Hango challenges more than the conditions of his confinement. He contends that his continued detention during the COVID-19 pandemic violates his substantive due process rights. Supreme Court and Sixth Circuit precedent support the conclusion that "where a petitioner claims no set of conditions would be sufficient to protect [his] constitutional rights, [his] claim should be construed as challenging the fact, not conditions, of [his] confinement and is therefore cognizable in habeas." *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), as amended (Apr. 6, 2020). The precedent addressed challenges to capital punishment. In *Nelson v. Campbell*, the Supreme Court held that a death-row inmate's habeas petition challenged only the method of his execution, and therefore his claim fell outside the "core" of habeas corpus. *Nelson v. Campbell*, 541 U.S. 637, 644-45 (2004). However, the Court speculated that if the challenged method "were a statutorily mandated part of the lethal injection protocol, or if as a factual matter petitioner were unable or unwilling to concede acceptable alternatives," there would be a "stronger argument that success on the merits, coupled with injunctive relief, would call into question the death sentence itself," making the claim cognizable in habeas corpus. *Id*. at 645. The Sixth Circuit relied on *Nelson* to uphold habeas jurisdiction over a claim where a petitioner challenged the method of his execution but did not concede that any acceptable alternative existed. *Adams v. Bradshaw*, 644 F.3d 481, 483 (6th Cir. 2011) ("Adams has not conceded the existence of an acceptable alternative procedure. . . . Thus, Adams's lethal-injection claim, if successful, could render his death sentence effectively invalid.")

District courts in this Circuit have relied on *Adams* to find jurisdiction in cases similar to the one at hand.  *See, e.g., Malam,* 2020 WL 1672662, at *3;  *Awshana*, 2020 WL 1808906, at *2 ("The petitioners allege that their continued detention violates their constitutional right under the Fifth Amendment, which forbids depriving a person of life, liberty, or property without due process of law. They contend that their continued detention will compromise their health and may kill them. They are entitled to advance their claim     and seek release from custody     under section 2241.")

Here, Hango has not conceded the existence of acceptable alternative conditions of his confinement; therefore his Fifth Amendment claim, if successful, would compel his release. Therefore, this court has habeas corpus jurisdiction over the claims related to his detention.

**C.      Standard for Preliminary Injunction**

The standard for granting a temporary restraining order is the same as that for a preliminary injunction. Injunctions are governed by Federal Rule of Civil Procedure 65.  Injunctive relief may only be granted when a party demonstrates four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc).  These four factors "are not prerequisites that must be met, but are interrelated considerations that must be balanced together. For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay." *Northeast Ohio Coal. for Homeless and Serv. Emps. Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (internal quotations omitted).  Dispositive weight should not necessarily be given to one

factor over the others.  *York Risk Servs. Grp., Inc. v. Couture*, 787 F. App'x 301, 304-05 (6th Cir. 2019).  However, the likelihood-of-success factor is the most important of the factors. *O'Toole v. O'Connor*, 802 F.3d 783, 792 (6th Cir. 2015).

The circuit courts have not yet addressed the multitude of claims for injunctive relief brought by immigration detainees fearing for their health and safety during the COVID-19 pandemic.  Many federal district courts considering these issues have found that insufficient jail action in light of the virus can serve as a basis for release as injunctive relief.  *See, e.g., Rafael L.O. v. Decker*, No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Cristian A.R. v. Thomas Decker, et al.*, No. 20-3600 (D.N.J. Apr. 12, 2020); *Basank v. Decker*, No. 20-2518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Castillo v. Barr*, No. 20-00605, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Malam v. Adducci*, No. 20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020).  Other courts have found that, if the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted. *See, e.g., Dawson v. Asher*, No. 20-409, 2020 WL 1304557 (W.D. Wa. Mar. 19, 2020) (rejecting request for a temporary restraining order ("TRO") because detainees could not succeed on merits of request for relief without at least showing concrete likelihood of actual injury as opposed to mere speculation in light of the legitimate governmental interest in detaining aliens throughout removal proceedings); *Sacal-Micha v. Longoria*, No. 20-37, 2020 WL 1518861 (S.D. Tex. Mar. 27, 2020) (rejecting habeas TRO based on medical conditions of confinement claim as that claim normally must be brought under § 1983, and in any event such a claim is not likely to succeed in the absence of a showing of deliberate indifference to the detainees medical needs); *Lopez v. Lowe*, No. 20-563,

2020 WL 1689874 (M.D. Pa. Apr. 7, 2020) (denying request for TRO by habeas petitioner as he could not establish deliberate indifference to his medical needs).

### 1. Irreparable Harm

In order to succeed in a claim for relief based on a jail official's insufficient treatment or deliberate indifference to his medical needs under the Due Process Clause, Hango must first show that, "absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm." *Richko v. Wayne Cty.*, 819 F.3d 907, 915 (6th Cir. 2016) *(citing Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 361 (6th Cir. 2013)). Hango asserts that, because of his preexisting medical conditions, the ongoing COVID-19 pandemic creates a high risk that absent an injunction by this Court, Hango is likely to experience irreparable injury, both in the form of loss of health or life, and in the form of an invasion of his constitutional rights. Respondent argues that the precautions ICE has taken at the Seneca County Jail, combined with the lack of a confirmed outbreak of COVID-19 at the facility, show that Hango is unable to demonstrate he is exposed to substantial risk of serious harm.

The risk of COVID-19 to individuals with certain underlying medical conditions, including "severe hypertension," clearly creates a substantial risk of serious harm. The parties dispute whether Hango's medical conditions are severe enough to place him in this category, and there is limited medical evidence in the record. However, medical records from both Geauga County Jail and Seneca County Jail confirm he has multiple preexisting medical conditions, including heart disease, hypertension and a history of stroke. (Doc. No. 35 at 1; Doc. No. 39-2.) Based on these conditions, which are still be managed with medication and regular blood tests, this Court concludes Hango is at high-risk of severe illness or death should he contract COVID-19.

16

Respondent further argues that Hango is more likely to contract COVID-19 outside of the Seneca County Jail then he is if he remains safely detained within.  (Doc. No. 36 at 10.)  However, Hango's risk of contracting COVID-19 outside of Respondent's custody is not relevant to the likelihood he will be exposed to irreparable harm in detention.   As other courts in the circuit have explained, "the standard for a Fifth Amendment claim examines the risks created by the government, here the risks created by Respondents' detention of Petitioners."  *Prieto Refunjol v. Adducci*, No. 2:20-CV-2099, 2020 WL 2487119, at *19 (S.D. Ohio May 14, 2020); *Jones v. Wolf*, No. 20-CV-361, 2020 WL 1643857, at *9, n.8 (W.D.N.Y.  Apr. 2, 2020) ("The violation necessarily ends when the individual no longer is in state custody.")  Although Respondent cites laudable measures being taken to prevent the spread of infection at the Seneca County Jail, the rapid spread of the disease in other correctional facilities in the state which were also taking precautionary measures demonstrates the near-impossibility of containing this disease once it has entered a correctional facility.[18]   Numerous courts have acknowledged that "the inherent congregate nature of the jail environment, combined with the unusually infectious nature of COVID-19, creates a high risk of infection of anyone inside the jail." *Prieto Refunjol ,* 2020 WL 2487119, at *18; *see, e.g., Coreas v. Bounds*, No. CVTDC-20-0780, 2020 WL 1663133, at *5 (D. Md. Apr. 3, 2020); *Fraihat v. ICE*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570, at *23 (C.D. Cal. Apr. 20, 2020). Further, the documented transmission of the disease from asymptomatic carriers shows that it is

---

[18] Patrick Cooley & Jim Woods, "More than 1,800 inmates at Marion Correctional test positive for coronavirus," (Apr. 19, 2020), https://www.marionstar.com/story/news/local/2020/04/19/1-800-inmates-marion-correctional-positive-coronavirus/5163285002/?utm_source oembed&utm_medium onsite&utm_campaign storylines&utm_content news&utm_term 5168084002.

17

impossible to prevent the spread of COVID-19 without widespread testing, which Respondent does not provide.[19]

Therefore, the Court concludes that Hango's continued confinement Seneca County Jail exposes him to a substantial risk of contracting COVID-19, which, due to his specific underlying health conditions, exposes him to a substantial risk of irreparable harm to his health or life.

### 2. Likelihood of Success on the Merits

The Due Process Clause of the Fifth Amendment to the United States Constitution forbids the government from depriving a person of life, liberty, or property without due process of law. U.S. Const. amend. V. The Supreme Court has held that this protection applies to "all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). Therefore, Hango's status as a non-US citizen does not exclude him from this Constitutional protection. The aspect of the Due Process Clause relevant here is the prohibition on imposing torture or cruel and unusual confinement conditions on non-convicted detainees. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt."). This type of Fifth Amendment claim is analyzed "under the same rubric as Eighth Amendment claims brought by prisoners." *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). Eighth Amendment claims require a showing of deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Under this analysis, "deliberate indifference" has both an objective and a

---

[19] The Seneca County Jails's precautionary screening of incoming shift workers for high temperatures is insufficient to stem the spread of disease, as "COVID-19 may be spread by people who are not showing symptoms." *How COVID-19 Spreads*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads. html (last visited May 19, 2020).

18

subjective component. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (*citing Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

To establish the objective component of deliberate indifference, a detainee must first show he faced a substantial risk of serious harm.  *Id.*  The objective component is satisfied here by showing that, "absent reasonable precautions, an inmate is exposed to a substantial risk of serious harm." *Richko v. Wayne Cty*., 819 F.3d 907, 915 (6th Cir. 2016) *(citing Amick v. Ohio Dep't of Rehab. & Corr*., 521 F. App'x 354, 361 (6th Cir. 2013)).  Here, Hango asserts that he is in a high-risk category due to multiple preexisting medical conditions including heart disease, hypertension and a history of stroke.  (Doc. No. 35 at 1.)  Respondent cites precautionary measures taken at Seneca County Jail, including restricting access to essential personnel and taking the temperature of arriving staff members.  However, given the confirmed presence of the virus in the surrounding community where essential jail staffers reside,[20] the documented infection risk presented by asymptomatic COVID-19 cases, and the virus' incubation period of up to fourteen days, the Respondent cannot credibly assert that detainees are unlikely to be exposed to COVID-19.

To establish the subjective component of deliberate indifference, a petitioner must show that the respondent had "a sufficiently culpable state of mind."  *Harrison*, 539 F.3d at 518 (internal quotation marks omitted).  This state of mind is shown "where 'the official knows of and disregards'" the substantial risk of serious harm facing the detainee.  *Id*.  Direct evidence about a defendant's knowledge is not necessary: the knowledge aspect of the subjective component can be inferred from the obviousness of the harm stemming from the risk.  *Hope v. Pelzer*, 536 U.S. 730,

---

[20]  According to the  Ohio Department of Health COVID-19 Dashboard,  there are a total of 552 confirmed cases in Seneca County and the six contiguous counties surrounding it. (*Id.*) https://coronavirus.ohio.gov/wps/portal/gov/covid-19/dashboards/overview/ (last visited May 19, 2020).

738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).  Here, Respondent asserts that Seneca County Jail's precautionary measures preclude a finding of deliberate indifference because government officials cannot be said to have disregarded the risk to Hango.  As noted above, officials at the Seneca County Jail have taken a range of laudable precautionary measures to protect against a potential outbreak. (Doc. No. 36 at 5-6.)  Yet, at the same time, ICE guidelines for the evaluation of COVID-19 risk to detainees mandate Hango's release.  (Doc. No. 36-3, Ex. K.)

Respondent provided a memorandum from Peter B. Berg, Assistant Director, Field Operations, setting forth the criteria for "COVID-19 Detained Docket Review," as of April 4, 2020. (*Id.*)  The Berg memorandum directs ICE Field Office Directors to re-assess custody for a number of categories of high-risk detainees, including those with heart disease.  (*Id.*)  Respondent acknowledged that Hango is currently receiving treatment for hypertension, high cholesterol and blood clots, and that Hango has a history of heart disease and stroke.  (Doc. No. 39 at 2-3.)  The Berg memorandum instructs that "[t]he presence of one of the factors listed above should be a significant discretionary factor weighing in favor of release."  (Doc. No. 36-3, Ex. K.)  However, Berg notes that the presence of a high-risk factor is not determinative, even for a discretionary detainee like Hango.  (*Id.*)  The evaluator must also consider whether temporarily releasing the detainee would "pose a danger to property or persons" based on factor such as prior criminal arrests or convictions, and also consider any risk of flight.  (*Id.*)

Respondent attests that Hango was screened in accordance with the Berg memorandum on March 26, 2020, and the evaluator determined Hango's health issues did not compel his release, when balanced against the other factors in that analysis.  (Doc. No. 39-1 at 2.)  Specifically, Respondent explains the reason Hango continues to be  in custody is because he has  "failed to

cooperate" with his removal by filing "non-meritorious pleadings in the immigration court and other forums . . . [and] failing to complete the necessary applications to renew his travel document." (Doc. No. 36 at 3.) This provides a valid basis for detention in normal circumstances, as discussed below. However, it does not establish any of the factors that would mitigate against temporary release during the current state of emergency. It is undisputed that Hango has been in this country since September 16, 1997, and has not been arrested nor convicted of any criminal offense. (Doc. No. 16 at 2.) Further, while Respondent asserts that Hango has vigorously opposed his deportation through legal channels, refused to apply for travel documents, and refused to board an airplane, there is no evidence he has ever attempted to flee, even after he was released from an earlier civil detention in 2006. (Doc. No. 1 at 2.) Although Respondent asserts that Hango's persistent resistence to deportation makes him a "flight risk," the undisputed facts show that, for thirteen years - after that initial period of detention ended, and before his current detention began - Hango "complied with the terms of his supervision" and received work authorization from the Department of Homeland Security. (*Id.*; Doc. No. 39 at 2.) Applying Respondent's own criteria, Hango should be released for the duration of the state of emergency, and the failure to do so establishes the subjective component of deliberate indifference.

Therefore, Hango is likely to succeed on the merits of his claim that his continued confinement during the COVID-19 pandemic violates his Fifth Amendment rights.

### 3. Public Interest

Respondent argues that the public interest factor weighs in favor of Hango's continued detention because "[t]he public interest in enforcement of United States' immigration laws is significant." (Doc. No. 36 at 17, citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981) ("The

Supreme Court has recognized that the public interest in enforcement of the immigration laws is significant.") (citing cases); *Nken v. Holder*, 556 U.S. 418, 435 (2009). This is indisputable. However, her further assertion that a Preliminary Injunction granting Hango's release would potentially apply to every immigration detainee because he has "no or minimal elevated risk factors for COVID-19," is not supported by the record. (Doc. No. 36 at 18.) The determination in this case necessarily involves consideration of Hango's unique and individual medical risk factors. Further, it is not clear from the record that it would be possible to deport Hango to Tanzania at this time, even if he fully complied with ICE's efforts, as international travel has been significantly disrupted by the global pandemic.[21] The enforcement of U.S. immigration laws against Hango will continue unabated should the Court grant the requested relief.

In a case implicating constitutional rights, like this one, "an inquiry into the public interest is difficult to separate from the likelihood of success on the merits because 'the public interest is promoted by the robust enforcement of constitutional rights.'" *Rhinehart v. Scutt*, 509 F. App'x 510, 516 (6th Cir. 2013) (*quoting Am. Freedom Def. Initiative v. Suburban Mobility for Reg. Transp*., 698 F.3d 885, 896 (6th Cir. 2012)). Here, the public interest favors Hango's release because, as the Sixth Circuit explained, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge Inc. v. Mich. Liquor Control Comm*., 23 F.3d 1071, 1079 (6th Cir.1994).

---

[21] *Global COVID-19 Pandemic Notice*, CDC, https://wwwnc.cdc.gov/travel/notices/ warning/coronavirus-global (last visited May 19, 2020) ("Many countries are implementing travel restrictions and mandatory quarantines, closing borders, and prohibiting non-citizens from entry with little advance notice. Airlines have cancelled many international flights and in-country travel may be unpredictable." ).

Further, Hango's continued detention poses an increased risk to public health.  Numerous courts have concluded that, given the highly unusual circumstances posed by the COVID-19 pandemic and ensuing crisis, "the continued detention of aging or ill civil detainees does not serve the public's interest." *Basank*, 2020 WL 1481503, at *6; *see also Malam*, 2020WL 1672662, at *13; *Fraihat v. U.S. Imm. and Customs Enforcement*, 5:19 Civ. 1546, 2020 WL 1932570, at * (C.D. Cal. Mar. 24, 2020).  Protecting public health and safety is indisputably in the public interest.  *See Neinast v. Bd. Of Trustees*, 346 F.3d 585, 592 (6th Cir. 2003) (recognizing public health and safety as legitimate government interests).

Based on the record before the Court, the only reasonable response by Respondent is the temporary release of Hango; any other response demonstrates a disregard of the specific, severe, and life-threatening risk he faces from COVID-19.

**D.**     **Conditions of Release**

In response to the Courts's request for supplemental briefing, Hango has represented to the Court that his wife and child have moved to a two-bedroom home in Los Angeles, California, and have the ability to provide home quarantine facilities for him there. (Doc. No. 41 at 3.)  However, Hango's submissions omit important details about his release. Specifically, Hango does not explain how he plans to travel to Los Angeles.  Therefore, by June 1, 2020,  Hango shall file declarations under oath laying out a concrete proposal for release under reasonable conditions, including at a minimum his plans for transportation to Los Angeles.  After reviewing the declarations, the Court will determine whether Hango has presented a satisfactory release plan.  In a release order, the undersigned recommends the Court impose at least the following conditions:

> 1. Hango shall reside and shelter-in-place at the home of his wife, at the address provided to the court;

2. Hango shall be transported from Seneca County Jail to his wife's residence under conditions that address the risk of flight;

3. Hango shall self-quarantine at his wife's residence for 14 days after his arrival, and shall follow all applicable public health directives after that time; and

4. Hango shall not violate any federal, state, or local law.

### III. Review of the Habeas Petition

Alternatively, Hango seeks expedited review of his habeas petition, which also seeks his release. Under the Antiterrorism and Effective Death Penalty Act of 1996, an expedited habeas review procedure is available only to inmates facing the death penalty, and only in states which comply with Title 28 U.S.C. § 2261(b) and (c), which imposes requirements for appointment of counsel for petitioners seeking post-conviction review of their capital sentences in the State court system. Clearly, expedited review is not appropriate in the instant case, which concerns the civil detention of an alien facing deportation. However, in the interest of conservation of judicial resources, the merits of the Petition have been addressed below.

Writs of habeas corpus "may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." 28 U.S.C. § 2241(a). Section 2241 "is an affirmative grant of power to federal courts to issue writs of habeas corpus to prisoners being held 'in violation of the Constitution or laws or treaties of the United States.' " *Rice v. White*, 660 F.3d 242, 249 (6th Cir. 2011) (quoting Section 2241(c)). As the Supreme Court has made clear, civil immigration detainees also have "the right to rely on 28 U.S.C. § 2241 to challenge detention that is without statutory authority," and therefore "§ 2241 habeas corpus proceedings [are] available as a forum for statutory and constitutional challenges to post-removal-period detention." *Zadvydas v. Davis*, 533 U.S. 678, 688, 121 S. Ct. 2491, 2497, 150 L. Ed. 2d 653 (2001).

24

Because Hango is appearing *pro se*, his pleadings are held to a less stringent standard than those prepared by counsel. *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001). However, this Court has a duty to promptly dismiss Petitions which fail to establish adequate grounds for relief. *Hilton v. Braunskill*, 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *see also Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (holding district courts have a duty to "screen out" petitions lacking merit on their face under Section 2243); *Jiang Lu v. U.S. ICE*, 22 F. Supp. 3d 839, 841 (N.D. Ohio 2014).

In his Petition, Hango alleges that he is being unreasonably detained because he has been in detention pending removal since March 6, 2019, far exceeding the 90-day "removal period" specified in 8 U.S.C. § 1231(a)(1)(A), (B). (Doc. No. 1 at 9.) He raises three "causes of action":

> I. The immigration and nationality act does not authorize Mr. Hango's detention because he has been released on a valid order of supervision. (*Id.*)

> II. Detention pursuant to a revocation of Mr. Hango's Order of Supervision is contrary to the Statute, violates ICE's own regulations, and violates Mr. Hango's civil rights. (*Id.* at 11.)

> III. Mr. Hango's detention is presumptively unconstitutional because he has already been detained for a prolonged period of time. (*Id.* at 14.)

**A.     Grounds I and II**

Grounds I and II of Hango's Petition assert that his detention is contrary to federal law and violates Hango's civil rights because he was previously detained pending deportation, and was released under a Federal District Court Order of Supervision. The record shows that Hango was held in detention for 21 months before being released under an Order of Supervision by the U.S. District Court for the Western District of Louisiana. (Doc. No. 1 at 8, *see also*, *Hango v. Att'y General*, 3:05-cv-02196, Judgment Adopting Report and Recommendation of the Magistrate Judge (W.D. La. Nov. 6, 2006).

In response, Respondent asserts that Hango's prior order of supervision is irrelevant to the legality of Hango's current detention because he is being detained to facilitate his removal in the reasonably forseeable future, as authorized by 8 U.S.C. § 1231(a)(6), which permits the detention of aliens who have been ordered removed beyond their "removal period" if, *inter alia,* the alien has a final order of removal, as Hango indisputably does. (Doc. No. 16 at 6.)  Further, Respondent asserts that the only barriers to Hango's immediate deportation arise from his failure to cooperate as required by law, both by filing multiple legal challenges to his deportation and by acts of civil disobedience including physically refusing to board a plane and refusing to sign an application for travel documents.  (*Id.* at 9.)

Hango responds by asserting that he is somehow not subject to removal because he remained in the county more than 90 days after his release from his previous immigration detention in 2006. This misconstrues the law in numerous ways.  When an order of removal becomes administratively or judicially final, the ICE prepares a warrant of removal. "*At any time thereafter*, the Service may initiate the steps to remove the alien." § 14:45. Execution of removal order, *Steel on Immigration Law* § 14:45 (2019 ed.) (emphasis added).

The undersigned agrees with Respondent that nothing in the prior order of supervision prohibited Hango's detention pending his imminent removal on a final order of deportation.  Hango asserts that he should have been given the opportunity to self deport, but the record reflects he had previously been granted the opportunity to self-deport and failed to do so.[22]   The Order of

---

[22]  In his Motion for Preliminary Injunction, Hango also asserts that ICE further violated his due process rights by failing to issue a Form I-166, known as a "bag and baggage letter" to allow him to prepare for his departure  before detaining him.  (Doc. No. 32 at 2.)  An alien is entitled to 72 hours notice of removal, which is commonly given via Form I-166, as Hango asserts.  *Arreaza-Cruz v. I.N.S.*, 39 F.3d 909 (9th Cir. 1994).  However, this notice is required for removal, not for detention pending removal.  Here, it is

Supervision (the "Order") that Hango relies on was signed on November 6, 2006, and required that Hango "be released from the custody of [ICE], under appropriate terms of supervision, pending removal." (Doc. No. 1-1.) It is undisputed that ICE released Hango under appropriate supervision for over ten years, as required by the Order. Further, it is undisputed that ICE attempted to deport Hango in an expedient manner following his detention: travel documents were received in May 2019 and Hango was scheduled for removal on flights in June and August 2019. (Doc. No. 36 at 2.) Moreover, ICE's decision to take Hango into custody to facilitate his removal when that removal was imminent is reasonable given that Hango had previously been given the opportunity to self-deport, and had not complied with that order. (Doc. No. 16-3.) Therefore, the first two causes of action are, at best, grounded in a misunderstanding of the law, and do not provide a basis for habeas relief. The Order of Supervision explicitly released Hango from custody "pending removal," it did not grant Hango indefinite residence in the United States until such time as he chose to self-deport.

## B.    Ground III

Ground Three of Hango's Petition asserts that his detention is "presumptively unconstitutional because he has already been detained for a prolonged period of time." (Doc. No. 1 at 14.) This was the basis for his previous habeas petition, which led to his release in November 2006. However, Respondent now asserts that Hango's own conduct since his re-detention in March 2019 caused his prolonged detention. (Doc. No. 39 at 2.) Where, as here, a detainee takes proactive measures to defeat a timely deportation, those actions provide a valid basis to extend detention beyond the initial 90-day removal period. Section 1231(a)(1)(C) explicitly provides that "[t]he

_____

undisputed that ICE detained Hango in March 2019, and first scheduled him for removal in June 2019. (Doc. No. 36 at 2.) Therefore, Hango's argument that he should have received a Form I-166 notice prior to his detention is based on a misunderstanding of the law.

removal period shall be extended beyond a period of 90 days and the alien may remain in detention during such extended period if the alien . . . acts to prevent the alien's removal subject to an order of removal." 8 U.S.C. § 1231(a)(1)(C).[23]

The Sixth Circuit has made clear that making legal challenges to removal are, in normal circumstances, not "acts to prevent removal" under the statute, because, "appeals and petitions for relief are to be expected as a natural part of the process," and an alien cannot be punished for "explor[ing] avenues of relief that the law makes available to him." *Ly v. Hansen*, 351 F.3d 263, 272 (6th Cir. 2003). Abuse of the legal process, as the Respondent alleges here, is another matter.

However, the Court does not have to determine whether Hango's multiple legal challenges to his deportation constitute abuse of the legal process sufficient to qualify as "acts to prevent removal," because his failure to complete the application for travel documents and his refusal to board the airplane on which his transit to Tanzania had been booked both clearly do. Respondent asserts, and Hango does not deny, that he "physically refused to board a removal flight in late 2019 and has refused to cooperate in applying for a new travel document to replace one that had expired due to Petitioner's obstruction. (Doc. No. 39 at 2.) In *Pelich v I.N.S.*, the Ninth Circuit held that a "detainee cannot convincingly argue that there is no significant likelihood of removal in the reasonably foreseeable future if the detainee controls the clock," by refusing to sign necessary travel documents or provide critical information to ICE. *Pelich v. I.N.S.*, 329 F.3d 1057, 1060 (9th Cir. 2003). Therefore, the Court explained, "a petitioner who impedes INS removal efforts 'has not met

---

[23] The Supreme Court held in *Zadvydas v. Davis* that detention after this 90-day removal period is permissible if limited to the "period reasonably necessary to bring about that alien's removal from the United States." *Zadvydas v. Davis*, 533 U.S. 678, 689, 121 S.Ct. 2491, 2498, 150 L.Ed.2d 653 (2001). The Supreme Court found a detention of six months was reasonable in most cases, and longer detentions should be subject to judicial review. *Id*.

his burden of showing that there is no significant likelihood of removal in the reasonably foreseeable future.'" *Id.* (citation omitted).  Multiple courts in this circuit have looked to *Pelich* when faced with similar scenarios. *See, e.g., Rawahna v. Attorney Gen. of United States*, No. 1:18-CV-175, 2018 WL 3023438, at *3 (S.D. Ohio June 18, 2018), *report and recommendation adopted*, No. 1:18CV175, 2018 WL 3348993 (S.D. Ohio July 9, 2018) ("petitioner is unable to prevail on any argument that his right to due process has been violated to the extent that he has remained in detention during the period following his September 7, 2017 refusal to board a plane to Jordan.")*; Mohamed v. U.S. Attorney Gen.*, No. 1:17-CV-573, 2018 WL 1904293, at *4 (S.D. Ohio Mar. 8, 2018), *report and recommendation adopted*, No. 1:17CV573, 2018 WL 1901801 (S.D. Ohio Apr. 20, 2018) ("Petitioner is unable to prevail on any argument that his right to due process has been violated to the extent that he has remained in detention during the period following his February 6, 2018 refusal to board a plane to Senegal."); *Lakhani v. O'Leary*, No. 1:08cv2355, 2010 WL 3730157, at *2 (N.D. Ohio Sept. 17, 2010) (holding that the petitioner's continued detention was not unconstitutional because the removal period was suspended when the petitioner acted to thwart his removal by refusing to board a series of flights scheduled to return him to Pakistan).

Hango has failed to sustain his initial burden of showing that, absent his own acts of obstruction, there is no significant likelihood he will be removed to Tanzania in the reasonably foreseeable future. *Alzubi v. Tryon*, No. 14-CV-705-JTC, 2015 WL 860792, at *8-9 (W.D.N.Y. Feb. 27, 2015).  Therefore, the undersigned concludes that Hango has not demonstrated that he is entitled to habeas corpus relief under 28 U.S.C. § 2241 based on any of the grounds raised in his Habeas Petition.

## IV. Conclusion

For the reasons stated above, the undersigned recommends that Hango's Application for a Preliminary Injunction should be conditionally GRANTED and his Habeas Petition be DISMISSED. Hango is hereby ORDERED to file declaration(s) providing the information identified in section II.D. above by June 1, 2020. The Court has been informed that, since his detention, Hango's wife and child have moved to Los Angeles, California, and have the ability to provide home quarantine facilities for him there. Therefore, the undersigned recommends the Court issue an order setting conditions of his release once Hango proposes a concrete and suitable release plan.


 *s/ Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 21, 2020

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**